**STATE of Missouri, Respondent,**

v.

**Lanny Alfred JACKSON, Jr., Appellant.**

No. 49836.

Supreme Court of Missouri,

Division No. 1.

July 8, 1963.

Thomas F. Eagleton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., Jefferson City, for respondent.

HOLLINGSWORTH, Judge.

Upon trial by jury in the Circuit Court of Greene County, defendant was found "guilty of attempted burglary as charged in the information" and his punishment was assessed at five years in the penitentiary. The information alleged that defendant "on or the 7th day of April A.D. 1962 at the County of Greene and State of Missouri, did then and there wilfully, unlawfully and feloniously and burglariously attempt to break into and enter a certain dwelling owned by S. A. Honeycutt, the same being used and occupied by Romona Kelly, of Springfield, Missouri, and the said Romona

Kelly being in the said dwelling at the time of the attempt to feloniously and burglariously break into said dwelling by forcing open a window of said dwelling, with the intent to molest a minor, to-wit: Romona Kelly, age 19 years, *by taking improper liberties* [1] with said minor, a felony; but he, the said Lanny Alfred Jackson, Jr., did then and there fail in the perpetration of said offense, crime and felony by being intercepted and prevented in executing and perpetrating the said offense as aforesaid, * * *." His motion for new trial was overruled and allocution was granted. Judgment and sentence ensued in conformity with the verdict of the jury.

■ Although represented by counsel at all pretrial, trial and aftertrial proceedings, including perfection of his appeal to this court, no brief has been filed in defendant's behalf. We, therefore, review all of the assignments of error validly set forth in the motion for new trial as required by S.Ct. Rule 27.20 and the portions of the record required by S.Ct. Rule 28.02, 4 RSMo 1959, pp. 4923 and 4925, 1 V.A.M.R., pp. 207 and 235.

Assignment No. 2 asserts error in overruling defendant's motion for directed verdict at the close of all of the evidence, on grounds the state failed to show by competent and substantial evidence defendant's intent to take "improper liberties *with the person of Romona Kelly*." Assignment No. 3 asserts error in the failure of the court to instruct the jury as to the meaning of the words *"improper liberties"* as used in the main and only instruction hypothesizing the facts necessarily to be found before the jury could return a verdict finding defendant guilty of the offense with which he was charged. The contention in that respect is that such an instruction was necessary for the guidance of the jury in returning their verdict. Consideration of the foregoing as-

signments requires a statement of the evidence.

At the beginning of the trial, counsel for the state was permitted to read to the jury § 563.160 RSMo 1959, V.A.M.S., [2] in words following: "Any person who in the presence of any minor, shall indulge in any degrading, lewd, immoral or vicious habit or practices; or who *shall take* indecent or *improper liberties with such minor*; or who shall publicly expose his or her person to such minor in an obscene or indecent manner; or who shall by language, sign or touching such minor, suggest or refer to any immoral, lewd, lascivious or indecent act, or who shall detain or divert such minor with intent to perpetrate any of the aforesaid acts, shall be considered as annoying or molesting said minor and shall upon conviction be punished by imprisonment in the penitentiary for a period not exceeding five years, or * * *," etc. The court thereupon declared to the jury that the statute "constitutes a felony under the laws of the State of Missouri."

Romona Dean Kelly testified in behalf of the state: She was 19 years of age on April 7, 1962, at which time she worked for a publishing company and resided in a third floor apartment at 616 N. Jefferson Avenue, Springfield, Missouri. There were three outside windows in the bedroom and one in the kitchenette, "it is somewhat like a hallway." There is a window on the east (rear) side of the house. Her bedroom windows had stained glass on the lower portion and curtains shielding any view above the stained portion of the glass. No one can see through the bedroom windows. She never undressed in front of the kitchen window through which she saw the person that night. The kitchen window is covered with a thin curtain through which one could be seen at night. During the evening of that day, April 7, 1962, she visited with her landlady, Mrs. Keele, on the main floor of

1. All emphases shown herein are those of this court.

2. To which revision all statutory references herein are made unless otherwise indicated.

the apartment house. At about 10:45 p. m., she went directly upstairs from Mrs. Keele's apartment to her apartment, got ready for bed, removed her clothing and put on her night dress in the bedroom and, as she stood in front of a mirror, started to roll up her hair. At that time she heard a noise, as if a screen were falling to the second floor roof. She looked around the corner from the bedroom and saw the reflection of a person outside the kitchenette window. She ran downstairs to tell Mrs. Keele, who called the police. Harold Wilson, who with his wife lived in the basement apartment, and Miss Kelly went outside to investigate. A fire escape ladder extended downward from that window. Colored people lived in a house located to the rear of and across an alley from and fronted toward Miss Kelly's apartment.

Harold Wilson testified in behalf of the state: His wife heard the commotion and called him. He ran through Mrs. Keele's apartment to the outside and saw a negro man on the fire escape. The man came down the fire escape ladder, thence down from the roof by means of a ladder, which defendant or some other person had recently placed on the north side of the rear of the apartment house. Wilson caught that man, the man got loose, Wilson chased him and saw him enter the rear of a house on Tampa Street, a block or more from the apartment house operated by Mrs. Keele. The police came, Wilson took them to the house he saw the man enter. They there arrested defendant. He was the man Wilson had seen come down the fire escape. Miss Kelly's kitchen window light was on and there was a neon light near by; the place was well lighted.

John E. Smith testified: He was on police duty that night and received a call to go to the apartment house where Miss Kelly lived. He shortly thereafter arrested defendant at the house to which he was told defendant had gone. Defendant, when arrested, was breathing heavily and sweat was standing out on his forehead. Defendant, questioned by Smith, denied he knew anything about the matter. He said he had been at the La Petite Bar and that, after leaving there, he had walked around.

Charles Oheim testified: He is and for more than three years had been a detective on the police force. As a part of his duties, he talked with defendant on the morning of April 8, 1962.

"Q. And, did you ask him what he intended to do after he got in there?

"A. Yes, I did. He said he didn't know whether he intended to have sexual relations with the girl that lived there or whether he intended to rob her; he said he didn't know who lived there, although he knew white people lived there.

"Q. He said he did know that white people lived there?

"A. Yes.

"Q. Did he have anything else to say concerning the matter?

"A. Not that I recall, right now."

Thereafter, as Detective Oheim testified, he, with the knowledge, consent and cooperation of Miss Kelly, inspected the premises in the rear of where she lived. He could clearly see her at any place in the kitchen through the kitchen window. He then went to the house where defendant resided, immediately in the rear of the apartment building in which Miss Kelly lived. He could and did there see Miss Kelly through the sheer curtain that covered the kitchen window, as she walked to the back of that room.

On cross-examination, Oheim testified:

"Q. Well, what did he (defendant) say he was doing up there? * * *

"A. He refused to say what he was doing up there.

 *     *     *     *     *     *

"Q. Well, what's all this sex talk, then? Where did that come in, who said that?

"A. Well, I did. I questioned him regarding that.

"Q. Those were your questions, then, and not what he said. You asked him if he was up there to have sexual intercourse, did you?

"A. Yes, I did.

"Q. But he didn't say he was up there to have it, did he?

"A. No. He didn't deny it, though."

Recalled, Miss Kelly further testified: The lights of her apartment were on while she visited her landlady that evening. When she returned to her apartment, she passed in front of the kitchen window through which she could be seen from the outside. She then wore street clothing and did not take off or put on any clothing in front of the kitchen window. As she, standing by the mirror in her bedroom, rolled up her hair, a portion of a person could be seen through the kitchen window by looking "just right on the corner of the doorway that enters [her] bedroom * * if they looked around the door." When she heard the screen fall, she was in front of her mirror and "just looked around the corner," after possibly taking one step to look around.

The evidence in behalf of defendant was, as follows: William Goodenkoff, who operated the La Petite Cocktail Lounge, on the night of April 7, 1962, testified: Defendant, who was formerly employed by him and was one of the best musicians in Springfield, came into the lounge after nine o'clock that night, asked if he could join the band, which is a privilege generally extended to former employees, such as defendant. Goodenkoff permitted him to do so. After defendant had played two numbers and had sung a song, Goodenkoff noticed that he was too intoxicated to play, asked him to leave and, defendant being unsteady on his feet, Goodenkoff escorted him out. It was then after ten o'clock.

Defendant testified: He was 31 years of age, born and reared in Tennessee, attended school to the 11th grade, went into military service, served almost four years, became a member of the army band, was honorably discharged and had been intermittently employed, both as a musician and at other jobs since then. He had lived at Alberta Harris' rooming house (facing the rear of Mrs. Keele's apartment house) for about a year when charged with this offense. His room was on the first floor of the rooming house.

During the day and evening of April 7, 1962, he joined a party at Alberta Harris' house, where he had drunk beer, gin and whiskey. About 10 or 10:30 o'clock that evening, he decided to go and did go to the La Petite Bar, where he was permitted to join the band. He was too drunk to play and was escorted out of the place. The next thing he remembered was when he was riding in a police car.

On the next morning he was questioned by Detective Oheim:

"Q. What did you tell him?

"A. Well, he asked me, says, 'What were you doing up there?' I told him, I says, 'I don't even remember being up there,' I says, 'I was drunk, out of my head.' And he says, 'I know what you was up there for,' he said I was trying to get in there and get a white girl. I says, 'No, I wasn't.' And he says, 'Would you sign a statement?' And I says, 'No, I won't sign a statement or anything.'

"Q. Did you tell him anything else?

"A. No; I didn't tell him anything else.

"Q. Did you hear him testify here today about you saying you were trying to get in there?

"A. Yes, he said that I said I was trying to get in there, but I didn't; I didn't say anything like that.

"Q. Do you remember being over to Romona Kelly's that night?

"A. No, I don't.

"Q. Do you remember being up on her fire escape?

"A. No, I don't.

"Q. Have you ever seen Romona Kelly before?

"A. No, I haven't."

Defendant later recalled that the first time he had ever seen her was at the preliminary hearing.

The brief filed by the Attorney General states that the fundamental issue in the case is: "Was there in fact evidence sufficient to support the jury's finding that [defendant] intended to enter Romona Kelly's apartment and take improper liberties *with her person?*" Actually, however, the defendant is not charged with an intent to take improper liberties *with her person.* The information charges only that he intended to molest her, a minor, by *taking improper liberties with her,* which the information further characterized as a "felony". Likewise, Instruction No. 1A, the principal (and only) instruction submitting the issue of defendant's guilt as charged in the information, merely hypothesized a finding of an attempted burglarious breaking and entering of Miss Kelly's apartment with the felonious intent to "molest the said Romona Kelly * * * *by taking improper liberties with said minor.*" In other words, the information does not charge nor does the submission instruction require a finding that the alleged intended molestation of Miss Kelly consisted of taking improper liberties *with her person.* And, of course, inasmuch as the alleged burglarious breaking and entry charged against defendant was admittedly interrupted, we think it clear that even though the evidence would justify a finding that a breaking and entrance was attempted with an intent on the part of defendant to commit "some felony or to steal therein," [3] there is neither charge nor proof that the alleged intent to molest Miss Kelly by the mere taking of *improper liberties* with her would necessarily constitute a fel-

ony within the meaning of §563.160, defining the molestation of a minor as therein denounced.

The well-written brief filed in behalf of the Attorney General concedes that "[w]hile it is true a general criminal intent will not suffice in this case, and that the State must show a specific intent on [defendant's] part to take *improper liberties* with Miss Kelly, it is also true that such intent can be inferred from the circumstances." That concession still begs the question, as we shall attempt to demonstrate.

There are many cases wherein burglary is charged by alleging breaking and entry with intent to commit "rape", "robbery", "larceny" (stealing), "murder", etc.; and the informations and instructions submitting those cases by the mere use of the word "rape", "robbery", "larceny", "murder", etc., are held to constitute an adequate description of the "felony" intended to be committed. Those rulings are correct and sound because those words, in and of themselves, sufficiently designate the felony intended to be committed. The Attorney General says, however, that the charge here made in the language of the statute and submitted in that language is sufficient, citing State v. Kornegger, 363 Mo. 968, 255 S.W.2d 765, a portion of which reads as follows, loc. cit. 767: "It is, of course, true that the defendant in a criminal cause has a constitutional right to demand the nature and cause of the accusation against him, and a criminal statute must be sufficiently clear that there can be no doubt as to when such statute is being violated. But we think the statute in question is sufficiently clear and definite in its terms and prohibitions. And it is our view that the information states an offense under the statute." But, the sentence appearing immediately before the quoted portion of the opinion must be read in connection therewith. That sentence reads: "The instant information charges that on April 17, 1951, in the presence of the named seven year old minor

---

3. See § 560.040 defining the burglary here attempted to be charged and proved.

(prosecutrix) defendant took *indecent and improper liberties* with said minor by exposing to her his private parts and having her rub the same with her hand and did thus annoy and molest said minor, contrary to statute." To the same effect are the informations (and, when considered, the instructions) in numerous other cases involving molestation of minors, as defined by § 563.160. See State v. Randall, Mo., 248 S.W.2d 860, 862; State v. Schubkegel, Mo., 261 S.W.2d 933; State v. McBrayer, Mo., 269 S.W.2d 756, 757; State v. Martin, Mo., 275 S.W.2d 336; State v. Daegele, Mo., 302 S.W.2d 20, 26 [16–18] [19–21]; State v. Mathews, Mo., 328 S.W.2d 642, 644–645.

We have been cited to no case, nor have we found one, involving an *attempted* burglarious breaking and entry of premises with intent to commit any of the offenses denounced under the so-called molestation-of-a-minor statute (§ 563.160). In such cases, it is obvious, however, that ordinarily there could be neither charge nor proof of the precise means intended to accomplish molestation of a minor within the purview of the statute, other than, of course, to allege and prove that the "improper liberties" intended to be taken with such minor were "improper", followed by a generalized description of the *lewd conduct denounced by the statute*. To permit the conviction of an accused of an intent to molest a minor by means of "improper liberties" without so limiting the meaning of the term "improper liberties" would, as we believe, subject him to conviction of an offense not denounced by the statute. "Molestation" may and often does mean misconduct other than that denounced by § 563.160. See "molestation", Webster's 3rd New International Dictionary, p. 1455. So also may, and often does, the phrase "improper liberties" mean misconduct other than that denounced by the statute. See "liberty", same Dictionary, p. 1303, note 4. For illustration, jurors not instructed as to the limited connotations of the statute could and, under the circumstances here shown, probably would find defendant guilty of molesting Miss Kelly by taking "improper liberties" with her, even though they actually made no determination whatever as to the purpose with which he attempted to break and enter her apartment. Indeed, a jury, not advised of the nature and meaning of the improper liberties contemplated under § 563.160, could well have found under Instruction No. 1A (submitting the issue of defendant's guilt of molesting Miss Kelly with intent to take improper liberties with her) that the "improper liberties" therein alleged included an intent to rob or to steal from her; or, possibly, an intent to seek no more than *social* intercourse with her. Yet, such a finding would be wholly beyond the felony defined in said § 563.160, upon which the prosecution was predicated.

Both the Attorney General and counsel for defendant tacitly agree that the guilt of defendant, as charged in the information, must be determined upon a finding of whether, in fact, the evidence was sufficient *to support a finding that defendant intended* to enter Miss Kelly's apartment with an intent to take improper lewd or lascivious liberties *with her person*. The jury, clearly, was not required to so find.

■ S.Ct. Rule 26.02 specifically requires: "(6) In all criminal cases the court, whether or not it shall have been requested so to do by either party, must instruct the jury in writing upon all questions of law necessary for their guidance in returning their verdict which shall include whenever necessary the subjects of good character and reasonable doubt. In all felony cases failure so to instruct shall be good cause for setting aside a verdict of guilty by the jury and granting a new trial." In the instant case, the transcript, as approved by counsel for both the state and defendant, shows: "The Court refused to instruct the Jury on the meaning of the words, 'improper liberties' contained in the amended information herein after Defendant requested the said instruction."

Frankly, we suspect that the meaning of that phrase, even when read by an ex-

perienced lawyer in context with the remainder of the statute, leaves him in doubt of its true meaning, especially as distinguished from other readily understood phrases therein set forth. "[W]here technical or other terms are used, and their meaning may not be comprehended readily by unprofessional persons, and it appears, from the whole case made, that the jury may possibly misapply them, they may or should be defined or explained in such a way as to give to the jury a correct idea of their meaning." 23A C.J.S. Crim. Law § 1191, pp. 484–485. See also State v. Chevlin, Mo., 284 S.W.2d 563, 567 [11, 12]; City of St. Louis v. James Braudis Coal Co., Mo.App., 137 S.W.2d 668, 670, 672–673. Under the circumstances here shown, we are convinced that the court erred in not making clear by instructing the jury, in substance, that "improper liberties", as used in Instruction No. 1A, meant a sexual assault upon Miss Kelly. In this connection, we think it well to note that the sufficiency of the information upon which the case was tried was not challenged. Upon retrial it may be that an amended information would make clear the "felony" denounced under § 563.160 which defendant allegedly intended to commit after breaking and entering Miss Kelly's apartment.

It may also be noted that there is at best in this case little, if any, substantial evidence that defendant knew or even believed that Miss Kelly or any other female person was present in the apartment when he attempted to break into and enter. There is no evidence that defendant knew Miss Kelly. The only direct evidence on that phase of the case is that he did not. Neither is there any evidence that he knew anything about the residents of the apartment house other than that he told the detective that he "did not know who lived there, although he did know that white people lived there"; and the further evidence that if the defendant, at any time prior to the time of the offense herein alleged, while at the rear of the apartment house when Miss Kelly was in front of the kitchen window and within the range of his vision, had looked he could have seen her. Admittedly, he could not have seen her when she was in her bedroom. Of course, it may be surmised that he had seen her in front of the kitchen window, but may it be lawfully inferred from the evidence that he in fact did see her? The question is a close one. If the evidence does not support a finding that defendant knew or believed that a female person would be found in the apartment he attempted to enter, it would be questionable as to whether the evidence in this record would support a finding of defendant's intent to commit the crime denounced by § 563.160. We are constrained, however, to reverse and remand the cause for such further proceedings as may better tend to resolve one way or the other the issue of defendant's guilt of attempted burglary as, we believe, insufficiently charged in the present information and may be sufficiently charged in an amended information.

◼ In remanding the case for a new trial, we think it well also to call attention to reversible error appearing in Instruction No. 6, defining the burden of proof required to afford defendant the benefit of evidence adduced with respect to his good character. That instruction reads:

"The good character of the defendant, *if proven to your reasonable satisfaction,* is a fact in the case which you ought to consider in passing upon the question of his guilt or innocence of this charge, for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good. But if all the evidence in the case, including that which has been given touching the good character of the defendant, shows him to be guilty of the charge, then his previous good character cannot justify, excuse, palliate, or mitigate the offense."

Defendant adduced substantial evidence as to his good character. He should have the

benefit of that evidence if the jury found from a preponderance of the evidence that he was of good character. See State v. Swinburne, Mo., 324 S.W.2d 746, 749; Bell v. Pedigo, Mo., 364 S.W.2d 613, 620.

Inasmuch as other errors complained of in the motion for new trial probably will not again occur in any future trial, we need not here consider them.

The judgment is reversed and the cause remanded.

All concur